**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 6747, 6748** |

**OBJECTION OF MFN PARTNERS, LP AND MOBILE STREET HOLDINGS, LLC TO (A) APPROVAL OF FOURTH AMENDED DISCLOSURE STATEMENT FOR THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF YELLOW CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE <u>BANKRUPTCY CODE AND (B) SOLICITATION PROCEDURES MOTION</u>**

---

[1] A complete list of each of the debtors in these chapter 11 cases (the "<u>Debtors</u>") may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 10990 Roe Avenue, Overland Park, Kansas 66211.

MFN Partners, LP and Mobile Street Holdings, LLC (collectively, "MFN/Mobile Street"), by their undersigned counsel, hereby submits this objection (the "Objection") to approval of the *Fourth Amended Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 6747] (the "Fourth Disclosure Statement") and the *Motion of Debtors for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Dkt No. 6748] ("Solicitation Procedures Motion").[2] In support of this Objection, MFN/Mobile Street respectfully state as follows:

## PRELIMINARY STATEMENT

1.  This is now the fourth effort of the Debtors (and second teaming up with the Committee) to proceed with confirmation of a liquidating plan [Dkt. No. 6746] (the "Fourth Plan").[3] Like the last effort, the Debtors and the Committee ask this Court to approve a disclosure statement that omits critical information, including the form of a Liquidating Trust Agreement even though the lack of unconflicted post-confirmation governance has been a major source of contention this entire year.

2.  At the July 8, 2025 status conference, the Debtors reported that they would be filing a simple waterfall plan without claim settlements that was supported by the Committee. Because what was promised was a waterfall plan, MFN/Mobile Street agreed to a continuance of a hearing on their conversion motion, but cautioned that a neutral waterfall plan that was akin to the Second

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Fourth Disclosure Statement or the Fourth Plan (defined herein), as applicable.

[3] MFN/Mobile Street was not involved at all in the drafting of, or negotiations over the Fourth Plan, Fourth Disclosure Statement and of Solicitation Procedures Motion. MFN/Mobile Street saw the papers for the first time when they were filed.

Plan [Dkt No. 5028] would be acceptable, but not one that compromised post-confirmation governance in favor of preferred creditors. The Debtors almost assuredly knew that MFN/Mobile Street would not support a "fox guarding the henhouse" post-confirmation trust (something the Debtors likewise refused to support until March 2025), which is what the Fourth Plan is.

3.     Like the last effort over the Third Disclosure Statement [Dkt No. 5996] and Third Plan [Dkt No. 5995] that began in late March 2025 and failed just weeks later (at significant and entirely unnecessary costs to the estates), the Fourth Plan is another example of the Debtors giving up stewardship solely to achieve confirmation of any plan, regardless of whether it reflects a good or bad outcome for stakeholders. And, like the botched Third Plan process, the Fourth Plan [Dkt No. 6746] – in its present form – is not confirmable and the Fourth Disclosure Statement obviously lacks adequate information; indeed, in instances it provides materially misleading information and contradicts information that the Debtors viewed as necessary when they obtained this Court's approval of the second amended disclosure statement (the "Second Disclosure Statement") [Dkt Nos. 5024, 5027, 5028].[4]

4.     MFN/Mobile Street understand that objections to a disclosure statement are not the proper vehicle to litigate the merits of confirmation issues (unless such issues render the proposed plan facially unconfirmable). Thus, this Objection is limited to defects in the Fourth Disclosure Statement and material problems with the Solicitation Procedures Motion.

5.     As a threshold matter, there are two surface positives to the Fourth Plan over the Third Plan. One, the Fourth Plan no longer "settles" any proofs of claim and purports to give effect to existing rulings of this Court regarding multi-employer pension plans ("MEPPs") –

---

[4] Attached hereto as **Exhibit 2** is a redline comparing the Fourth Disclosure Statement to the court approved Second Disclosure Statement.

rulings that have disallowed billions in asserted claims.  One obvious benefit of giving effect to these rulings is that projected recoveries for general unsecured creditors of YRC, Inc. (the debtor with the most real property assets and the one with the largest number of general unsecured creditors) see their recoveries go from, at best, 16% of allowed claims to a top end recovery of 24.3% though, as discussed below, even this number appears artificially low.  Two, the Fourth Plan does not categorically wipe out Yellow's public shareholders but at least preserves the possibility of a recovery.

6.     But then the Fourth Plan and the relief sought in the Solicitation Procedures Motion undermine these benefits in multiple ways.  Specifically:

- ***The Committee members call the shots on post-confirmation governance with no disclosures on managing conflicts***: though the Debtors did <u>not</u> agree to this in connection with the Second Plan, and despite the fact that since that time the Debtors and MFN/Mobile Street have been overwhelmingly successfully disallowing overstated claims of Committee members, the Debtors hand post-confirmation governance to the Committee members.[5] This is the fox guarding the henhouse.  Moreover, despite having months to work on this obvious problem, the Debtors and the Committee have not disclosed the form of liquidating trust agreement and will only do so just seven days before the voting deadline and after the deadline to object to the Fourth Disclosure Statement.  This is inexcusable.

- ***Inappropriate estate releases and exculpations***: the Fourth Plan gives Committee members releases and exculpation, substantially risking both pending claim objections to Committee members and the lawsuit against the IBT.  The Fourth Plan expressly releases every Committee member from any estate "Causes of Action" and that definition expressly includes "the right to object to or otherwise contest Claims or Interests".  Further, every Committee member is exculpated for all conduct during these cases, including holding up confirmation of the Second Plan and trying to ram through the Third Plan.  None of these should be approved and should be subject to a true independent fiduciary's review.

- ***Separate Debtor classification***: it is far from clear whether creditors of each Debtor vote in separate classes or as a single Class.  The Plan contains one class – Class 5 – and the treatment and voting calculation does not appear to depend on the debtor.  While the Fourth

---

[5] The Committee gets to select four of five members of the post-confirmation trust board and nominate the Liquidating Trustee.

Disclosure Statement has a table showing Class 5 creditor's estimated recovery by Debtor, there is no disclosure on how this was determined. Importantly, general unsecured creditors of YRC stand to gain or lose the most; there should be no confusion that each Debtor's general unsecured creditors vote separately.

7.      In addition to these material defects, the Fourth Disclosure Statement fails to provide adequate information that are materially important to the voting decision of general unsecured creditors and the residual rights of equity security holders.

8.      *First*, the Second Disclosure Statement had information that remains relevant now and yet the Debtors and the Committee deleted it from the Fourth Disclosure Statement. Most notably, the Second Disclosure Statement had detailed information concerning Yellow's prepetition One Yellow efforts and (according to the Debtors) the irreparable damage caused by the IBT. The Fourth Disclosure Statement also omits background facts regarding the Debtors' initial successful sale process (including MFN's involvement) but instead suggests that the Debtors acted only with the Committee's consultation even though MFN/Mobile Street is not aware of a single winning bidder brought to the table by the Committee.

9.      The Fourth Disclosure Statement should include all of the prior disclosures contained in the Second Disclosure Statement and should disclose the names of any winning bidders that the Committee uniquely identified.

10.     *Second*, the Disclosure Statement should adequately disclose the nature of the Debtors' pending claim against the IBT, and the range of values associated with such claim. Though the Fourth Disclosure Statement has one brief section describing the pending litigation against the IBT (the "IBT Suit"), in one place it omits the fact that the Tenth Circuit scheduled oral argument[6] and it does not properly describe the magnitude of the Debtors' damages at stake

---

[6] At page 28 of the Disclosure Statement there is reference to the appeal but no disclosure of the fact that the Tenth Circuit has scheduled oral argument. It later shows up at page 50.

4

in the IBT Suit, which the Debtors themselves expect to be significant, as they are seeking lost equity value, all of the avoidable costs resulting from the shutdown of the Debtors' business, and the Debtors' being forced to file these bankruptcy cases.  Said differently, if the Debtors can establish liability against the IBT, they can make the case that the consequential damages of the IBT's actions include any withdrawal liability claims, any WARN claims, and the avoidable costs associated with these chapter 11 cases.

11.    ***Third***, the Fourth Disclosure Statement grossly understates what has happened this year, particularly in connection with the Third Plan.  The Fourth Disclosure Statement describes the process giving rise to the Third Plan as "hard fought" and "arms' length."  As demonstrated by the conversion motion that MFN/Mobile Street filed, that process was anything but.  What happened is that in the span of less than 10 days the Committee (i) threatened to file its own plan (giving itself control over post-confirmation governance and to be confirmed before the Third Circuit appeal), (ii) got the so-called "Milbank Group" onboard by giving that group allowed claims in excess of filed claim amounts, (iii) then got the Debtors to agree with the idea only MFN/Mobile Street would remain in the way, and (iv) then tried to convince this Court to defer ruling on pending summary judgment motions.  The Fourth Disclosure Statement needs to include this history.

12.    The Fourth Disclosure Statement should further disclose tables demonstrating how overstated claims of MEPPs were being allowed under the Third Plan solely to obtain a plan settlement and what are their "allowed" amounts now according to the Debtors.

13.    It should disclose that the undisputed fact that Debtors only agreed to the plan settlements set forth in the Third Plan after the Committee first obtained support from a different set of MEPP claimants by agreeing to allow their claims in amounts greater than those claimants

filed in their proofs of claim. It should disclose that both the Debtors and the Committee actively tried to block this Court from issuing the Preliminary MEPP Opinion and that, by failing in this regard and being forced to abandon the Third Plan, the result is ***improvement*** to recoveries to the estates' stakeholders (albeit to the detriment of Committee members and MEPP claimants).

14.     Relatedly, because the Committee is a co-proponent, it should disclose why it has not elected to join objections that uniquely impact members of the Committee. For example, the Committee did not join objections to Central States's penalty claim (asserted in an amount north of $900 million) or the 50% subordination issue – all of which massively benefit the Committee's constituency who are not MEPPs. The Committee should explain in full why it has proceeded this way, especially when under the Fourth Plan the Committee gets to control post-confirmation governance.

15.     ***Fourth***, the Fourth Disclosure Statement must disclose the fact that the Debtors' estates have commenced over 650 preference adversary proceedings and the risks attendant with these actions. One, given that Yellow had positive market value during the entirety of the 90-day preference period until the IBT strike notice, it is problematic that the Debtors have brought actions that presume insolvency, especially when such actions might inadvertently weaken the damages sought in the pending IBT Suit. Two, the Fourth Disclosure Statement should disclose that even though certain Committee members received transfers within 90 days of the Petition Date, not a single current member was sued.[7]

16.     ***Fifth***, the Fourth Disclosure Statement does not adequately address how the Liquidating Trust Board of Managers will act with regard to considerations and voting on

---

[7] Last week MFN/Mobile Street pointed out to the Debtors several flaws in the Solicitation Procedures, including (a) not accounting for court rulings with respect to prior temporary allowance stipulations and (b) depriving targets of preference actions of the right to vote. The Debtors have agreed to fix these flaws but, as of the date of this Objection, have not filed revised Solicitation Procedures.

prosecuting and resolving (a) objections to MEPPs' claims, including appeals, and (b) the IBT Suit.  The Fourth Disclosure Statement should disclose the mechanism for the Liquidating Trust Board to recuse themselves from voting on claims and claim objections (the "<u>Recusal Mechanism</u>") in which any Trust Board member has a specific interest, given the apparent conflict.  As stated above, given the history of these cases and the positions (or lack thereof) of the Committee to date with respect to claim objections and key litigation, this information should in this case be required to be included in the Fourth Disclosure Statement and not revealed only shortly before the Voting Deadline.  The estates should not spend significant sums soliciting another plan without these disclosures when post-confirmation governance and recusal procedures were at the heart of the failure to obtain confirmation of the Second Plan.[8]

17.    Accordingly, the Court should not approve the Fourth Disclosure Statement unless it is modified to address these matters explicitly.  But if this Court is inclined to approve the Fourth Disclosure Statement, MFN/Mobile Street respectfully requests that the Court mandate the inclusion of a letter in the solicitation packages that MFN/Mobile Street prepared explaining

---

[8]  *See Statement of the Official Committee of Unsecured Creditors Regarding Motion of Debtors for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Dkt. No. 4950] (noting the Committee's position that it should select the Liquidating Trust and Liquidating Trust Board of Managers) (Nov. 11, 2024); *Limited Objection of MFN Partners, LP and Mobile Street, LLC to Approval of First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 4864] (stating the importance of disclosures related to post-confirmation governance and noting the potential conflicts of certain Committee members) (Nov. 14, 2024); *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Terminating the Debtors' Exclusive Period to Solicit Acceptances of a Plan or, in the Alternative, Converting the Chapter 11 Cases to Cases under Chapter 7 of the Bankruptcy Code* [Dkt No. 5564] ("The Committee and its constituents that oppose the Plan simply cannot and will not support a plan that leaves these governance matters in the Debtors' control. . . .") (Jan. 28, 2025); *Objection of MFN Partners, LP and Mobile Street Holdings, LLC to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Terminating the Debtors' Exclusive Period to Solicit Acceptances of a Plan or, in the Alternative, Converting the Chapter 11 Cases to Cases under Chapter 7 of the Bankruptcy Code* [Dkt No. 5614] ("conversion of these cases to chapter 7 may at some point be appropriate if a confirmable plan with proper governance procedures is not put before this Court.") (Feb. 4, 2025); *Motion of MFN Partners, LP and Mobile Street Holdings, LLC for Entry of an Order Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [Dkt. No. 6204] (discussing the disputes over post-confirmation governance that plagued the voting and confirmation process for the Second Plan) (April 29, 2025).

why MFN/Mobile Street recommend voting against the Fourth Plan.[9]  A form of the letter (the "MFN/Mobile Street Letter") is attached hereto as **Exhibit 1**.

## DISCLOSURE STATEMENT OBJECTION[10]

18.     The Fourth Disclosure Statement should not be approved because it does not provide adequate information.

## I.     Legal Standard

19.     A disclosure statement must include "adequate information," which the Bankruptcy Code defines as "information of a kind, and in sufficient detail … that would enable a hypothetical reasonable investor … to make an informed judgment about the plan." *See* 11 U.S.C. § 1125(a). Given the reliance that creditors and courts place on disclosure statements, the "obligation to provide sufficient data to satisfy the Code['s] standard" cannot be "overemphasize[d.]"  *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3d Cir. 1988).   Disclosure statements must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or reject the Plan." *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

20.     What constitutes "adequate information" is a flexible standard based on the facts and circumstances of the case.   11 U.S.C. § 1125(a)(1).   ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records.").   This

---

[9]   The Court authorized the Committee to submit a letter opposing the Second Plan so neither the Debtors nor the Committee should complain.

[10]   MFN/Mobile Street is not providing a factual background but instead will identify facts relevant to the arguments raised herein.

includes information that would enable "a hypothetical investor of the relevant class to make an informed judgment about the plan." *Id.* Among several factors courts consider to determine if a disclosure statement contains adequate information is the "financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan." *In re Metrocraft Pub. Servs., Inc.,* 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984). The burden is on the plan proponent to produce a disclosure statement that contains adequate information. *See Gen Elec. Credit Corp. v. Nardulli & Sons, Inc.,* 836 F.2d 184, 188 (3d Cir. 1988).

21.     Courts in this Circuit have recognized that a disclosure statement containing adequate information plays a pivotal role in chapter 11 cases. *See, e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2003). The Third Circuit has reiterated: "The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information." *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988); *see also In re Forest Grove, LLC*, 448 B.R. 729, 737-38 (Bankr. D.S.C. 2011) ("The purpose of a disclosure statement is to clearly provide creditors with information regarding the debtors' plan and their treatment under that plan.").

### a. The Fourth Disclosure Statement Does Not Adequately Disclose Facts Concerning Estate Claim Releases and Exculpation of the Committee Members

22.     The Fourth Plan provides that the estates release all "Released Parties" from all "Causes of Action" and any other flavor of claim or remedy, excluding actual fraud, willful misconduct, or gross negligence. Fourth Plan at § IX.B. The Fourth Plan defines "Released Parties" to include every present and former member of the Committee and any *ex-officio* members. *See id.* at § A.120. The term "Cause of Action" is defined to include a laundry list of

types of causes of action, claims, defenses and, importantly "the right to object to or otherwise contest Claims or Interests." *Id.*at § I.A.28.  The term "Claim" means "any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or Debtor's Estate." *Id.*at § I.A.30.

23.     Thus, by its terms, the Debtors' estates release any causes of action against, and any right to object to or contest any proof of claim filed by, any Committee member.  That includes the IBT, Central States, and New York Teamsters, all of which are the subjects of pending or potential claim objections and, in the case of the IBT, the subject of a pending lawsuit.  The one exception is that "Retained Causes of Action" are excepted from estate releases, *see* Plan § IX.B, and that term is defined to mean, among other things, "any pending lawsuits, legal proceedings, collection proceedings, and claims arising from certain multiemployer pension and welfare plan matters and certain WARN Act matters." *Id.* at § I.A.122.  Aside from the vagueness of this description as it would apply to Committee members, by its terms it does not apply to the IBT Suit or pending or forthcoming claim ***objections***.[11]

24.     The Fourth Disclosure Statement is far from clear on this point.  At minimum, it should clearly state whether the Debtors are releasing the IBT and releasing Central States and New York Teamsters from pending and potential claims and claim objections, including appeals. It is not sufficient to bury this information in a Schedule of Retained Causes of Action to be filed (and not even served on voting creditors) a week before the Voting Deadline.

25.     Moreover, the Fourth Disclosure Statement makes no effort to explain why any Committee member should be released or exculpated at all.  The Committee has done little in these

---

[11]  Even if the Fourth Plan assumes all existing rulings of this Court remain in place, if a Committee member has a pending appeal (which both Central States and New York Teamsters do), the Fourth Plan could be read to mandate that the Liquidating Trust cannot oppose such appeals.

cases to justify releases.  Indeed, but for the Committee's insistence on objecting to the Second Disclosure Statement – solely over control of post-confirmation governance – these cases likely would have been confirmed in February 2025, saving tens of millions of dollars in administrative expenses and avoiding the delay for months in payments of undisputed priority claims of former employees.[12]  The conduct was exacerbated by what occurred in connection with the Third Plan, including the Committee agreeing  to allowed claims far in excess of even the proof of claim amounts in order to obtain plan support, its vociferous attempt to deny MFN/Mobile Street standing as an objecting party, and its argument that this Court had to apply the most deferential standard under Bankruptcy Rule 9019(a) under the guise of a "plan settlement."  No Committee member should get a pass for this conduct – not without an independent fiduciary taking a hard look.

    **b.  The Fourth Disclosure Statement Does Not Adequately Disclose the Value and Plan for the IBT Suit**

26.    The Debtors disclosed in their First Amended Disclosure Statement that "The Debtors believe they are entitled to a judgment against various unions in the amount of at least $137.3 million."  *See* First Amended Disclosure Statement at 48.  Yet as stated repeatedly in the Debtors' first day declaration, the Debtors are suing the IBT for the loss of enterprise value resulting from the IBT's bad faith actions, and the value of the Debtors' claims against the IBT, aside from the $137.3 million mentioned, is at least $1.5 billion.  *See* Dkt. No. 14, ¶¶ 10, 88.  In fact, the Fourth Disclosure Statement specifically deletes information that was approved by this

---

[12]  MFN/Mobile Street made clear it favored paying such priority claims early.  Moreover, to the extent that estate assets do produce value sufficient to pay all claims in full, the delay caused by the Committee necessarily caused avoidable postpetition interest.

Court for inclusion in the solicitation of the Second Disclosure Statement without any rationale for such deletion.[13]

27.    Specifically, on June 27, 2023, the Debtors announced that "Yellow is entitled to $137.3 million (and counting) for the injury the [IBT] has caused Yellow, and continues to cause Yellow, and in the event of its demise, *at least* $1.5 billion for the loss in enterprise value Yellow is sustaining as a result of the Union's breaches."  *See Union Leadership's "Militant Approach" Risks Tens of Thousands of Jobs and Taxpayers' Investment in Company*, GLOBE NEWSWIRE (June 27,    2023)    https://investors.myyellow.com/news-releases/news-release-details/yellow-corporation-files-137-million-lawsuit-against, last viewed August 18, 2025 (emphasis added).

28.    Moreover, the Debtors' estates may be able to claim as consequential damages all of the costs they have incurred that would have been avoided but for the IBT's conduct, including withdrawal liability, WARN claims, and the administrative costs of these chapter 11 cases. Whether they are ultimately successful remains to be seen, but creditors should know of the possibility that there is a substantial asset of the Debtors' estates to be pursued that the Debtors intend to hand control of to the Committee (if the Fourth Plan does not already release it).  And the Debtors have also incurred millions of dollars in litigation costs pursuing the IBT Suit, fairly demonstrating their belief that the claims against the IBT hold significant value and are well worth the time, money and effort being expended by the estates.

29.    The Fourth Disclosure Statement's discussion of the IBT Suit does not adequately inform creditors of the substantiality of its litigation assets such that those creditors can make "an

---

[13]  *Compare* Second Disclosure Statement at p. 50 § VII.H ("If the appeal reverses the trial court decision and the case is remanded, Yellow will seek damages against the Union, the success of which could materially improve the recovery to unsecured creditors.  Regardless of the outcome of the appeal, there has yet been no resolution as to the merits of the Debtors' claims against IBT, TNFINC, and several local unions.") *with* Fourth Disclosure Statement at p. 50, Section VII.H (language omitted).

informed judgment about the plan," as required under 11 U.S.C. § 1125(a)(1), and should be amended accordingly.

### c. The Disclosure Statement Lacks Information Regarding Post-Confirmation Governance

30.     The Fourth Disclosure Statement states that the Committee will designate a "Liquidating Trustee to wind down the Debtors' remaining affairs, pay, and reconcile Claims, and administer the Plan in an efficient manner."  Fourth Disclosure Statement at 2.  Unlike the Court-approved Second Disclosure Statement, here the Committee designates the trustee with the Debtors only having consultation rights.  Moreover, the Committee appoints four of five members of the post-confirmation Trust Board.

31.     This is far from the neutral waterfall plan that was expected to be filed when announced at the last status conference.  Instead, the Trust is to be controlled by the Committee and the Trust controls all of the Debtors' estates pending claim objections and causes of action.  The biggest such matters all involve Committee members.  It is the classic "fox guarding the henhouse."[14]  This Court has noted the trustee of a post-confirmation trust "owes a fiduciary duty to the beneficiaries of the trust, which includes taking appropriate steps to maximize the corpus of the trust." *In re AIO US, INC, et al.,* Case No. 24-11836, 2025 WL 2426380, at *27 (Bankr. D. Del. Aug. 21, 2025) (internal citations omitted).

32.     For example, as written, the Fourth Plan may give the Liquidating Trust the power to change this Court's ruling on the 50% subordination issue (under the guise of a deferential Rule 9019 "lowest point of reasonableness" standard), which overwhelmingly benefits MEPPs and

---

[14]  At the hearing on MFN/Mobile Street's conversion motion, the Court noted that if creditors were voting against a plan because the Debtors were not giving such creditors allowed claims, that might be grounds for designation under Bankruptcy Code section 1126(e).  MFN/Mobile is concerned that the combined releases to Committee members and giving the Committee near-total control of post-confirmation governance is tantamount to the very conduct that could give rise to vote designation.

directly harms all other general unsecured creditors. Two of the largest MEPP holders are Committee members. It is inconceivable that the Liquidating Trust could decide to "settle" this matter without a true independent fiduciary.

33.     Moreover, the Liquidating Trust Agreement has not been provided to stakeholders and thus there is no disclosure of any recusal mechanism to ensure fair administration of the assets of the Liquidating Trust. MFN/Mobile Street has repeatedly raised this concern; it is stunning that in nearly four months after this Court issued on April 7 its Preliminary MEPP Opinion, the Debtors and the Committee could not provide to stakeholders this critical information and instead propose to reveal this information merely one week before the voting deadline in a filing that would not even be served on all voting creditors. Given that this issue has been central to confirmation and conversion disputes in these cases for the last nine months this is information that should be clearly disclosed and highlighted in the Fourth Disclosure Statement before votes on the Fourth Plan are solicited.

34.     MFN/Mobile Street believes the right answer is that there needs to be an independent fiduciary to oversee matters involving Committee members and MEPP claim objections. This is a critical part of the MFN/Mobile Street Letter that should be included with any solicitation package.

35.     Absent such information, the Fourth Disclosure Statement cannot be said to contain "adequate information" as required by the Bankruptcy Code.

**d.  The Fourth Disclosure Statement Fails to Disclose Treatment and Voting by Class 5 and Contains Misleading Information Regarding Estimated Claim Recoveries**

36.     The Fourth Plan contains a single general unsecured claim class – Class 5. While it appears that in fact each Debtor has its own Class 5 class, it is not clear how treatment occurs because, under the Plan, the treatment is the same regardless of the Debtor even though, as

reflected on page 10 of the Fourth Disclosure Statement, estimated recoveries by Debtor vary for

Class 5. Stated differently, under the Fourth Plan a creditor of YRC receives a pro rata share of

assets of the Trust in the same manner as a creditor of Express Lane Service, Inc. even though

these two Debtors have materially different assets. If that is not the case, the Fourth Disclosure

Statement should make clear the estimated assets and Class 5 claims *for each Debtor*.

37.     Further, it is not clear whether the Debtors expect to seek confirmation aggregating

Class 5 or on a Debtor by Debtor basis. Clearly, it should be evaluated Debtor by Debtor. *See In

re AIO US, INC*, 2025 WL 2426380, at *30. The Fourth Disclosure Statement should clarify this

in plain terms so that individuals who may not have the resources to hire counsel can at least have

some understanding.

38.     Moreover, the Fourth Disclosure Statement offers no facts to explain the basis for

the chart at page 10, which purports to show general unsecured claim recoveries by individual

Debtor and states that the aggregate universe of general unsecured claims ranges from $1.25 billion

to $1.7 billion. This is particularly problematic for YRC because MFN/Mobile Street believes the

reported range of 12.7% to 24.3% is materially wrong.

39.     According to the Second Disclosure Statement, YRC's general unsecured creditors

were expected to receive between 6.3% and 24.2% if the Debtors *lost* the 50% subordination issue

but between 10.7% and 38.3% if the Debtors won the 50% subordination issue. The Second

Disclosure Statement indicated that the aggregate amount of general unsecured claims between

$2.3 billion and $4.7 billion – much higher than the range projected in the Fourth Disclosure

Statement. Since the Debtors prevailed on the 50% subordination issue and the overall claims

pool according to the Fourth Disclosure Statement is at least $1 billion less than the claims pool in

the Second Disclosure Statement, it makes no sense why the recoveries to YRC creditors have

gone down (instead of up).  The Fourth Disclosure Statement must explain the bases for the differences.[15]

40.    At minimum, the table below should be included in the Fourth Disclosure Statement and the Debtors and Committee should explain how they arrived at the estimated percentage recoveries for YRC based on prevailing on the 50% subordination issue, including why there is a materially lower recovery as compared to the Second Disclosure Statement when the claims pool is significantly less now:

| DISCLOSURE STATEMENT | GROSS DISTRIBUTABLE VALUE[16] | GENERAL UNSECURED CLAIM POOL | YRC LOW END RECOVERY | YRC HIGH END RECOVERY |
|---|---|---|---|---|
| Second Disclosure Statement | $665 million-$975 million | $2.3 billion - $4.7 billion | 10.7% | 38.3% |
| Third Disclosure Statement[17] | $750-$800 million | $3.65 billion - $4.05 billion | 12.0% | 16.0% |
| Fourth Disclosure Statement | **Not stated** | $1.25 billion - $1.7 billion | 12.7% | 24.3% |

---

[15]  For example, if projected asset sales have not achieved what was anticipated, the Fourth Disclosure Statement should say so.  If the estates have incurred unanticipated administrative expenses, it should quantify that amount and make clear whether the expenses could have been avoided had the Second Plan been confirmed.

[16]  Value available to pay administrative, priority, and general unsecured claims.

[17]  The Third Plan allowed $3.2943 billion in claims for "Electing J&S Holders" and provided for a transfer of value to effectively equalize the recoveries across all Debtors' general unsecured creditors.

16

### e. The Fourth Disclosure Statement Omits Material Information Contained in the Second Disclosure Statement and Relating to the Third Plan and MFN/Mobile Street's Conversion Motion

41.     The Fourth Disclosure Statements omits a significant number of background facts that were included in the Second Disclosure Statement.   **Exhibit 2** is the redline showing the differences.   There is no explanation why, especially when this Court approved the Second Disclosure Statement.   All of the previously approved background facts should be included in the Fourth Disclosure Statement.

42.     Moreover, the Fourth Disclosure Statement gives short shrift to what the Debtors and Committee attempted to do, why it failed, and the fact that they delayed moving the cases forward such that MFN/Mobile Street moved to convert these cases to chapter 7.   Reading the Fourth Disclosure Statement, the Debtors and Committee would have the reader believe that the Third Plan was overall beneficial but because the Court issued a ruling it made it impossible to proceed and that MFN/Mobile Street's conversion claim was denied outright.[18]

43.     That's misleading.   Instead, what happened is that between March 14 and March 21 2025, the Debtors and Committee tried to "settle" claims with preferred claimants (dominated by Committee members) that was disproportionately unfavorable to nearly all other creditors.   It failed because, despite the Debtor and the Committee actively trying to defend what they had done, this Court did release its decision that unambiguously demonstrated that the "settlement" was indefensible.

44.     In order to demonstrate this court of conduct, the Fourth Disclosure Statement should have a chart that shows what the Debtors and Committee attempted to do "settling" claims

---

[18]   The conversion motion was not denied outright, but denied without prejudice with a Court-authorized hearing scheduled for August 4, 2025 to consider the motion.   *See* July 8, 2025 Tr. at 12 (noting there was a pending motion to convert that was continued to August 4).   By agreement, the conversion motion has been continued to September 4, 2025.

as opposed to what "settling" claimants filed and what has been the outcome of Court decisions.[19] The chart is divided to show Committee members, other "Groom Law" group members, and the so-called "Milbank" ad hoc group members.  Claims in bold are ones higher than asserted in proofs of claim:

| CLAIMANT | FILED CLAIM AMOUNT | THIRD PLAN "SETTLED" AMOUNT | MAXIMUM ALLOWED POST-50% SUBORDINATION AMOUNT[20] |
|---|---|---|---|
| *Committee Members* | | | |
| Central States – Withdrawal Liability | $4.827 billion | $1.028 billion | $350 to $369.65 million |
| Central States – Guarantee | $917 million | $618 million | $0.00 |
| New York Teamsters – Withdrawal Liability | $757 million | $235 million | $115 to $167 million |
| New York Teamsters – Liquidated Damages | $76 million | $76 million | [pending objection][21] |
| *Other Groom Law Group* | | | |
| TENJ Fund | $14 million | $3.2 million | $1.125 million |
| 707 Pension Fund | $245 million | $51.8 million | $14 to $17.1 million |
| Management Labor Local 1730 | $66 million | $54.2 million | $2.5 million |

---

[19]  The Debtors know this information because they produced it to MFN/Mobile Street in connection with discovery relating to the Conversion Motion (in response to Interrogatory No. 4) and it was subsequently admitted as an exhibit in connection with the hearing on such motion (Exhibit No. 36).  However, the Debtors produced it as a confidential document so MFN/Mobile Street is not replicating it herein.

[20]  This is based on existing rulings as calculated by MFN/Mobile Street.

[21]  The Debtors have not yet objected to this claim even though there are good arguments for doing so.

| | | | |
|---|---|---|---|
| Local 701 | $42 million | $4 million | $2.75 million |
| Freight Drivers Local 557 | $56 million | $10.1 million | $3.6 million |
| *Milbank Group* | | | |
| New England Teamsters | $285.02 million | **$451.72 million** | $80 million to $110 million |
| Local 710 | $113.72 million | **$117.00 million** | $0 |
| Central Pennsylvania | $81.77 million | **$98.95 million** | $13 to 15 million |
| Philadelphia Teamsters | $36.79 million | **$41.08 million** | $6.5 to $9.69 million |
| IAM National | $22.82 million | **$29.99 million** | $5.62 to $7 million |
| Local 641 | $217 million | $30 million | $8.75 to $10.175 million |
| **TOTALS** | **$7.757 billion** | **$2.849 billion** | **High end $715.59 million to $791.59 million** |

45.     Creditors should know that the same proponents of the Fourth Plan tried to allow, via a purported settlement, over $2 billion in claims greater than what should have been allowed, benefitting only select Committee members and a select group of other MEPPs.  The distributable value associated with this excess is at least $320 million,[22] which is millions more than the entire pool of non-MEPP/non-PBGC claimants that supposedly were receiving "gifts" via the settlement.

---

[22]  16% of $2.48 billion, representing the top end of the range set forth in the Third Disclosure Statement.

**f.   The Fourth Disclosure Statement Lacks Adequate Information Regarding Resolution of Collateral Posted for Certain Claims**

46.     The Fourth Disclosure Statement discusses at pages 50 and 51 the ADR Procedures and mentions the Auto Policy with ORIC.  It reads as if the estates may face no further liability associated with the claims.  This is consistent with the ADR Motion [Dkt. No. 1329] which represented: "The Debtors believe that all or substantially all of the Litigation Claims (if and to the extent they are valid) should be covered under the Motor Carriers Indemnity Insurance Policies issued by Old Republic Insurance Company ('ORIC') to the Debtors (the 'ORIC Policies') or otherwise under other insurance policies held by the Debtors and issued by other insurers, or by third-party payors (the 'Third-Party Payors') in accordance with the terms of such insurance policies." ADR Motion at ¶ 2.  If that is not the case, the Fourth Disclosure Statement should state what is the estimated range of claims in excess of insurance policies and/or posted collateral.

47.     Further, the Fourth Disclosure Statement should disclose the amount of collateral that was posted and what has happened to such collateral.  MFN/Mobile Street understands that the Debtors arranged for $231,020,627 in letters of credit, which ORIC drew postpetition and has been holding.  *See* Dkt No. 823.  Thus, the letter of credit proceeds may ultimately be assets of the Debtors' estates because the issuing banks' reimbursement claims have been satisfied in full.

**g.   The Fourth Disclosure Statement Lacks Adequate Information Regarding the Debtors' Preference Adversary Proceedings and Their Potentially Adverse Impacts**

48.     The Fourth Disclosure Statement fails to discuss that the Debtors have launched over 650 adversary proceedings, all seeking avoidance as preferences under Bankruptcy Code section 547 payments the Debtors made within 90 days (the "<u>Preference Complaints</u>").  The Preference Complaints also seek disallowance of claims of preference recipients under Bankruptcy Code section 502(d).

49.     The Debtors went after creditors who received payments as small as under $12,000. *See* Adv. Pros. 25-51842, 25-51848, 25-51851.   Indeed, the largest amount was less than $10 million.  *See* Adv. Pro. 25-51602 (against Comdata, Inc) (the "Comdata Preference Complaint"). The Debtors often acknowledged that the preference target likely received payments in the ordinary course or provided subsequent new value but, because it is an affirmative defense, the defendant bears the burden of proof.  *See, e.g.,* Comdata Preference Complaint at ¶ 25 (seeking to avoid $9,986,008.71 but identifying $9,930,861.76 in possible subsequent new value invoices and acknowledging ordinary course defense); *see also* Adv. Pro. 25-51536 (against Norfolk Southern Corporation) ((seeking to avoid $9,529,752.55 but identifying $7,798,674.30 in possible subsequent new value invoices and acknowledging ordinary course defense).

50.     There are several significant material matters arising from this decision by the Debtors.[23]  ***One***, by bringing preference complaints, the Debtors arguably accept the premise that they were insolvent during that 90-day period.  Of course, Yellow Corp. was a publicly traded company and its stock price ranged between $0.57 and $3.90 over the entire 90-day period.[24] Further, any assertion of insolvency contradicts numerous statements by the Debtors prepetition and in the early days of these cases.  Indeed, the Debtors' first day declaration squarely blamed the IBT for the Debtors' financial collapse and, *but for* the conduct of the IBT, the Debtors' business would have survived.  And since the Debtors sought $1.5 billion in *lost equity value*, it appears deeply problematic to pursue the IBT and at the same time file complaints that necessarily require the Debtors to have been insolvent.  While Bankruptcy Code section 547 presumes

---

[23] Mobile Street, as assignee, holds a claim that is subject to section 502(d) disallowance.

[24] For most of the period, Yellow's stock was above $1.00 with hundreds of thousands of shares traded daily.

insolvency for preference claims, it is rebuttable, and nowhere in the complaints do the Debtors acknowledge that they were solvent during that 90-day period.[25]

51.      ***Two***, the vast majority of the Preference Complaints clearly implicate ordinary course and/or subsequent new value defenses, meaning that no doubt the complaints were filed with little intent to actually prosecute them versus simply trying to "convince" targets that a quick cheap settlement was a small cost versus hiring counsel to fight.[26]  Not surprisingly, already the estates have dismissed several preference actions just weeks after suing.[27]  The Fourth Disclosure Statement should disclose whether the Debtors have diligenced such defenses so that creditors are not misled into believing that the Preference Complaints are likely a meaningful source of recovery.

52.      For example, in the Preference Complaint launched against Mobile Street's assignor, Belk Logistics LLC, which seeks to avoid $4,392,500.97 and disallow claims, the Debtors concede that $3,682,645.32 "potentially" qualifies for the subsequent new value defense. *See* Adv. Pro. No. 25-51271 (CTG), Cmplt. ¶ 25.  But because the defense is an affirmative defense, the burden is on the defendant to prove it.  The complaint also noted the possibility of the ordinary course defense.[28]

---

[25] MFN/Mobile Street pointed out this very issue before the Debtors launched their cookie-cutter, Preference Complaints.

[26] This is one reason that section 547(b) was amended to attempt to impose on estates a duty of accounting for reasonably known affirmative defenses before suing to avoid the obvious form of extortion that occurs.  But even if a complaint satisfies this, knowingly pursuing a preference claim in the face of obvious defenses could give rise to malicious prosecution claims and one day a target (and a court) will say enough is enough with such conduct.

[27]  S*ee* Adv. Case Nos. 25-51278, 25-51332, 25-51487, 25-51418, 25-51425, 25-51542, 25-51571, 25-51726, 25-51792 & 25-51846.

[28]  A quick look at the dates of invoices and payments strongly suggests <u>every</u> payment was made in the ordinary course.  *See* Adv. Pro. No. 25-51271 (CTG), Cmplt. Exhibit A.

53.    **Three**, while the Debtors fired off near-identical complaints against over 650 targets, no present or prior Committee member was sued for preferences.  And yet, according to the Debtors' statements of financial affairs, five current Committee members and several former ones received payments in the 90-day period.[29]  There is no disclosure why the Committee members have been treated differently.[30]

54.    **Four**, the Preference Complaints all rely on factual background contained in the Third Disclosure Statement – which was never approved for solicitation.  Importantly, that disclosure statement was premised on a plan wiping out equity security holders (the Fourth Plan does not) and assumed allowed claims in much greater amounts.  It is far from clear why the estates thought it was a smart idea to incorporate by reference a document that has now been disregarded.

55.    The Fourth Disclosure Statement must include these facts and some explanation why the Committee members received favorable treatment.

## SOLICITATION PROCEDURES OBJECTION

56.    The Solicitation Procedures Motion as filed contains several provisions that unfairly disenfranchise, or materially burden voting rights of, creditors and allow the Plan Proponents to unfairly "game" the system by not fully counting creditor votes for numerosity purposes and should be revised before being approved.  Counsel for MFN/Mobile Street contacted counsel to the Debtors regarding certain of these issues, and counsel to the Debtors agreed to

---

[29] *See* Docket No. 446.

[30] One Committee member, BNSF Railway Company, received the single largest amount in the 90-day period ($36,171,007.87) but it was not sued.  Notably, in February 2025, the Debtors and BNSF entered into a stipulation allowing certain claims with mutual releases, which likely released any preference claims the estates had.  *See* Dkt. No. 5655.  The stipulation did not even mention the possibility of preference risk to BNSF.  If the Debtors actually believe that the preference claims have merit, it is strange that the Debtors have sued over 650 entities but failed to even mention a preference claim for the largest recipient when it entered into the stipulation with BNSF.  Further, Michelin North America, a former Committee member, received over $4 million in payments within 90 days.  *See* SOFA at Docket No. 446.  It too was not sued for preferences.  Of course, all former Committee members will be released under the Fourth Plan.

certain revisions in the proposed form of order that resolve the MFN/Mobile Street concerns regarding (i) permitting creditors who are the subject of preference actions to vote their claims without the requirement to file a 3018 Motion notwithstanding the preference action, (ii) providing a fair deadline for the filing of 3018(a) Motions in relation to the deadline for claim objections to disallow such claims for voting purposes; and (iii) clarifying that orders approving temporary voting stipulations entered into in connection with voting on the Second Plan are vacated and of no force and effect with respect to voting on the Fourth Plan.[31]

57. In addition, MFN/Mobile street provided additional informal comments that have not yet been agreed to. To the extent the Plan Proponents to do not agree to these in advance of the hearing, the Court should require revisions to the Solicitation Procedures requiring that they (i) require any stipulations to temporary claim allowance to be filed with the Court sufficiently in advance of the Voting Deadline to allow other parties in interest an opportunity to object to any amounts agreed to by the Plan Proponents; (ii) not aggregate multiple claims held by a single creditor for voting purposes; (iii) not deem duplicative claims that have not been objected to in advance to be a single claim; and (iv) not allow the Claims and Noticing Agent unfettered discretion to contact some parties about deficient ballots without requiring that they contact all such parties submitting deficient ballots.

58. First, any temporary claims allowance stipulated to by the Plan Proponents should be filed with the Court sufficiently in advance of the Voting Deadline to allow other parties in interest an opportunity to object to the amounts stipulated by the Plan Proponents before such stipulations are submitted for approval by the Court. Requiring such stipulations to be filed on

---

[31] As a result, MFN/Mobile Street has not included any argument with respect to these issues in this objection but reserves the right to supplement with such arguments should the Debtors remove any agreed upon language prior to the hearing.

or before September 26, 2025 with a deadline for objections by other parties in interest on or

before October 10, 2025 would allow a reasonable process to ensure the Plan Proponents do not

agree to temporary allowance amounts that are unreasonable or inconsistent with current rulings.

59.    Second, the Solicitation Procedures in section E.2.i propose to aggregate votes on

all claims owned by a claimant and count such votes as a single creditor for numerosity purposes.

This proposal is contrary to the language of section 1126(c), which requires acceptance by

"creditors . . . that hold . . . more than on-half in number of the allowed *claims* of such class held

by creditors . . . that have accepted or rejected such plan."  11 U.S.C. § 1126(c) (emphasis

added).[32]  To aggregate all claims held by a single creditor and count such claims as a single vote

for numerosity purposes harms creditors holding several unrelated claims and is contrary to the

language of the statute.

60.    Third, the Solicitation Procedures in Section E.2.k also provide that any creditor

who has filed or purchased duplicate claims shall be provided only a single ballot regardless of

---

[32]  *See also Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.)*, 118 F.3d 635, 640 (9th Cir. 1997) (finding that holders of multiple claims can vote each claim and that "[i]t would not make much sense to require a vote by creditors who held "more than one-half in number of the allowed claims" while at the same time limiting a creditor who held two or more of those claims to only one vote. If allowed claims are to be counted, they must be counted regardless of whose hands they happen to be in."); *In re Gilbert*, 104 B.R. 206, 210 (Bankr. W.D. Mo. 1989) ("The formula contained in Section 1126(c) speaks in terms of the *number of claims*, not the number of creditors, that actually vote for or against the plan. . . . Votes of acceptance, such as those cast by [the creditor] are to be computed only on the basis of filed and allowed proofs of claim."); *Concord Square Apartments v. Ottawa Properties (In re Concord Square Apartments)*, 174 B.R. 71 (Bankr. S.D. Ohio 1994) ("The Court finds that a purchaser of claims is entitled to a vote for each separate claim it holds. This conclusion is supported by 11 U.S.C. § 1126(c), which states: 'A class of claims has accepted a plan if such plan has been accepted by creditors, . . ., that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, . . ., that have accepted or rejected such plan.'  The language distinguishes between claimholders and claims. The formula contained in § 1126(c) speaks in terms of the number of claims, not the number of creditors, that actually vote for or against the plan. Thus, a creditor such as Ottawa, which holds multiple claims, has a voting right for each claim it holds.") (internal quotations and citations omitted); *In re Kreider*, No. 05-15018ELF, 2006 Bankr. LEXIS 2948, at *8-9 (Bankr. E.D. Pa. Sept. 27, 2006) ("Even more importantly, it appears that the Debtors' unstated premise — i.e., multiple claims voted by a single creditor are counted as a single vote for purpose of the "more than one-half in number of allowed claims" requirement for acceptance of a plan set forth in 11 U.S.C. § 1126(c) — is simply incorrect.") (citing *In re Gilbert*, 104 B.R. 206, 210 (Bankr. W.D. Mo. 1989)); *In re Artiusid, Inc.*, No. 23-11007-cgb, 2024 Bankr. LEXIS 1711, at *20 (Bankr. W.D. Tex. July 23, 2024)) (looking to section 1126 numerosity for purposes of analogy and noting that the numerosity requirement "requires a tally of the *claims*, not of the creditors; a creditor can hold and vote more than one claim.  Case law confirms this point.").

whether the Debtors have objected to such duplicate Claims. These cases have been pending for over two years and the Debtors have filed more than thirty omnibus objections. Included in these objections have been "substantive" duplicate claims. While MFN/Mobile Street is not seeking to have creditors vote more than is fair, it is similarly unfair to provide the Debtors the discretion to eliminate claims from voting without the proper procedure of notice and an opportunity to seek temporary allowance under Bankruptcy Rule 3018(a).

61.    Fourth, the Claims and Noticing Agent should not be given unfettered discretion to contact creditors submitting deficient ballots about correcting any deficiencies. MFN/Mobile Street has no objection to creditors being notified about the submission of a deficient ballot and allowed an opportunity to correct any deficiencies. However, the Claims and Noticing Agent should not be permitted discretion to decide which creditors to contact and which to ignore and thus not count. Either all creditors submitting deficient ballots should be contacted and afforded an opportunity to correct deficiencies or none should. To allow discretion to an agent of the Debtors would potentially permit the Debtors to pick and choose which creditors to afford such opportunity to and to manipulate the voting results.

## **CONCLUSION**

WHEREFORE, for the reasons set forth in this Objection, MFN/Mobile Street respectfully request that the Court (1) deny approval of the Fourth Disclosure Statement or (2) to the extent that the Court is inclined to approve the Fourth Disclosure Statement, require the Fourth Disclosure Statement to be modified to include the additional information set forth in this Objection.

Dated: August 26, 2025
      Wilmington, Delaware

Respectfully Submitted,

*/s/ L. Katherine Good*
L. Katherine Good (No. 5101)
Maria Kotsiras (No. 6840)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email: kgood@potteranderson.com
      mkotsiras@potteranderson.com

– and –

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Eric Winston (*pro hac vice* admitted)
Benjamin Roth (*pro hac vice* admitted)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
Email:  ericwinston@quinnemanuel.com

*Counsel for MFN Partners, LP and Mobile Street
Holdings, LLC*